# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BRENDA K. SITRON**
           **Plaintiff,**

     **v.**                                  **Case No. 13-C-0968**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
           **Defendant.**

---

## DECISION AND ORDER

Plaintiff Brenda Sitron applied for social security disability benefits, but the Commissioner denied her application. Plaintiff now seeks judicial review of that decision. On review of the record and the briefs, I affirm the denial.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Medical History

In her application, plaintiff alleged that she became disabled on August 30, 2001, when she slipped and fell on a wet floor at work. (Tr. at 301.) Emergency room doctors assessed a left humeral fracture, placing her in shoulder immobilizer (Tr. at 301-05), and scans of the left shoulder revealed a non-displaced fracture involving the greater tuberosity and an AC joint sprain (Tr. at 306). On September 4, plaintiff saw Dr. T.W. Grossman, who referred her to physical therapy and imposed workplace restrictions on finger, wrist, and elbow motion on the left without weight, but no restrictions on the right. (Tr. at 298.) On September 7, she saw Dr. Clifford Poplar, now complaining of back and hip pain. Dr. Poplar assessed lower back strain, left shoulder fracture, left hip contusion, and left ankle contusion, prescribing Naprosyn. (Tr.

at 362.)  Scans taken on September 11 revealed mild to moderate changes involving the mid and lower cervical spine, early degenerative changes involving the lower lumbar region, and prominent scoliosis involving the thoracolumbar spine.  (Tr. at 299-300.)  A September 18 x-ray of the left shoulder revealed a non-displaced fracture of the greater tuberosity, which appeared to be healing.  (Tr. at 297.)  In September and October, plaintiff underwent physical therapy, self-discharging due to minimal progress.  (Tr. at 289-96.)

On October 23, 2001, plaintiff saw Dr. Bradley Fideler, an orthopedist.  On exam, she had a significant amount of pain and limited range of motion.  On repeat x-ray, Dr. Fideler noted minimal displacement of her greater tuberosity fracture.  His impression was persistent left shoulder pain, minimally displaced greater tuberosity fracture, and possible rotator cuff injury.  He ordered an MRI to determine whether her cuff was intact.  (Tr. at 311.)  On October 30, plaintiff returned to Dr. Fideler, who noted that the MRI showed a minimally displaced greater tuberosity fracture, which appeared to be healing, and no obvious rotator cuff tears.  Dr. Fideler found nothing surgical, allowing her to continue with physical therapy working on her motion and strength.  He limited heavy lifting with the left arm for the next four weeks.  (Tr. at 355, 358.)

On November 26, 2001, Dr. Fideler filled out a work restriction form, indicating that plaintiff could return to work with no lifting greater that 10-15 pounds and no reaching/lifting above the shoulder.  (Tr. at 310.)  On December 4, plaintiff told Dr. Fideler that she continued to have pain with certain positions, which limited her ability to lift with the shoulder.  Dr. Fideler recommended that they continue to work on range of motion and strengthening, and not rush into anything surgically.  (Tr. at 354.)  On December 12, Dr. Fideler reiterated the same restrictions, which were to remain in effect until her next appointment in January 2002.  (Tr. at

2

309.)

On January 2, 2002, plaintiff returned to Dr. Fideler, "doing relatively well." (Tr. at 308, 353.) Her motion and strength were improving, although she still got pain from time to time. Dr. Fideler did not recommend surgery but rather conservative treatment. (Tr. at 308, 353.)[1]

On January 22, 2002, plaintiff saw Dr. Timothy Rusthoven, a podiatrist, regarding right foot pain. On exam, Dr. Rusthoven noted normal range of motion and muscle strength, but some tenderness on palpation within the mid-lateral area of the right foot. X-rays showed mild degenerative arthritis. Dr. Rusthoven diagnosed capsulitis of the metatarsal joints of the right foot, recommending a cortisone injection, but plaintiff declined; instead, she was fabricated a removeable Elastoplast strapping with medial arch support to see if this would help realign her foot and take pressure away from the injured area. She was to return in two weeks. If not better, Dr. Rusthoven would reinforce the idea of a cortisone injection. (Tr. at 307, 349, 351, 352.)

On February 7, 2002, plaintiff returned to Dr. Rusthoven, stating that she had been less active and her foot felt better; however, she believed that if she increased activity she would have the same pain. Dr. Rusthoven continued to believe a cortisone injection the best initial form of treatment, but plaintiff did not want to go through with the injection. He told her to try wearing orthotics. (Tr. at 350.)

On February 18, 2002, plaintiff returned to Dr. Fideler for follow up of her left shoulder pain, doing somewhat better motion- and strength-wise. She still got some scapular and trapezius pain, as well as arm pain from her previous fracture. Clinically, she seemed to be

---

[1]In January, April, and June 2002, plaintiff sought chiropractic care for her neck, mid-back, and shoulder complaints. (Tr. at 312-43.)

progressing somewhat slowly with regard to strength. Dr. Fideler recommended that plaintiff continue to work within conservative parameters to try to improve her strength and motion. (Tr. at 348.)

On March 11, 2002, plaintiff saw Dr. Poplar complaining of neck spasms/stiffness. She did not want medications, and he diagnosed her with a neck strain. (Tr. at 360.)

Plaintiff returned to Dr. Rusthoven on March 26, 2002, regarding her right foot pain. On exam, he noted no edema or erythema, but there was definite pain on palpation of the subtalar joint. He told plaintiff he believed it was inflammation in the subtalar joint, which might be resolved by cortisone injection. Again, she did not want the injection. (Tr. at 346.)

On April 26, 2002, Dr. Fideler prepared a report in connection with plaintiff's workers' compensation claim, assessing 5% permanent partial disability (ppd") at the left shoulder. He listed her prognosis as good, indicating she was to follow up as needed. (Tr. at 441.)

On April 30, 2002, plaintiff saw Dr. John Orwin at the sports medicine clinic for evaluation of her left shoulder pain. Dr. Orwin noted that, following a course of therapy, plaintiff returned to work after her injury. However, she subsequently noticed increasing symptoms of left shoulder pain and had been off work since January 4, 2002. Dr. Orwin diagnosed rotator cuff tendinitis of the left shoulder, with a recommendation of physical therapy. (Tr. at 368.) X-rays revealed an old, healed, distal clavicular fracture with associated widening of the AC joint. (Tr. at 370.)

On May 31, 2002, plaintiff returned to Dr. Poplar for follow up of her left shoulder. (Tr. at 360.) Dr. Poplar diagnosed rotator cuff tendinitis, recommending physical therapy. (Tr. at 360.)

On August 13, 2002, plaintiff saw Dr. Rusthoven for follow up, indicating that she

4

continued to have intermittent right foot pain, worse with activity. On exam, Dr. Rusthoven noted no edema or erythema of either foot; palpation of the right foot still produced some tenderness. Range of motion was not symptomatic, and muscle strength was normal. Dr. Rusthoven's impression was chronic right foot pain, possibly the result of arthritis of the calcaneal cuboid joint. He decided to order an MRI to rule out other pathology. (Tr. at 345.)

On October 21, 2002, plaintiff saw Dr. Poplar complaining of bilateral wrist pain, attributed to a typing class. She had no loss of strength or sensation in the hands, and full range of motion of the arms. They discussed an EMG, but plaintiff elected to wait, using Advil as needed. (Tr. at 359.)

On January 17, 2003, plaintiff returned Dr. Orwin at the spine clinic, continuing to have left shoulder pain. She also complained of right shoulder and neck pain. She reported difficulty at night if not taking Tylenol PM. She received physical therapy initially but none recently. She had been seeing a chiropractor for her neck and scoliosis problems. On exam, Dr. Orwin noted an obese woman who appeared uncomfortable with any movement. She was vague in responses in regards to what caused the pain. Dr. Orwin referred her to rehabilitation for evaluation. (Tr. at 366.)

On March 17, 2003, plaintiff saw Dr. Bonnie Weigert at the spine clinic, on the consultation request from Dr. Orwin. Imaging studies revealed degenerative disc disease at C5-C6 and C6-C7 and L3-L4, as well as significant thoracic scoliosis. Plaintiff reported neck and low back pain, as well as pain in her wrist and numbness in her fingers from typing. She reported not having much therapy for the neck and shoulder due to difficulty getting it covered by insurance. She tried chiropractic, which did not improve her symptoms. She reported that Tylenol PM relieved her pain quite well, although she did have some grogginess with it. (Tr.

at 363.)  She also reported grogginess with Naprosyn, Vioxx, and Relafen.  (Tr. at 363-64.)  On exam, her cervical range of motion was severely limited in all directions.  She also had mildly decreased lumbar range of motion.  She had a normal and symmetric gait, and was able to heel and toe walk.  She had normal strength of the upper extremities, except for shoulder abduction and the rotator cuff musculature.  She also had mild cervical, segmental, and parascapular muscle tenderness.  Dr. Weigert found this "a difficult case."  (Tr. at 364.)  "[S]he probably had a lot of myofascial symptoms as a result of her initial injury and now we have compounded that with 1-1/2 years of disuse and contracture with poor cervical mechanics as well as the shoulder injury[.]"  (Tr. at 364.)  Dr. Weigert found that plaintiff would benefit from a thorough physical therapy program addressing both the neck and the shoulder; however, she had no health insurance and could not afford it.  Dr. Weigert suggested that plaintiff try regular Tylenol throughout the day for pain relief.  (Tr. at 364.)

On September 11, 2003, plaintiff was seen for a toe injury.  She was able to ambulate with mild pain.  She was given a hard soled shoe for support and advised to take Tylenol as needed for pain.  (Tr. at 376-77.)  A September 12 x-ray of the right foot revealed an acute non-displaced fracture of the fourth toe, mild degenerative changes of the first metatarsophalangeal joint, and a prominent calcaneal spur as well as ossification at the Achilles tendon insertion site.  (Tr. at 375.)

Plaintiff apparently received no further medical treatment until September/October 2005, when she saw Dr. Steven Bartz, complaining of back and neck pain.  He prescribed medications, including Flexeril, and physical therapy.[2]  Dr. Bartz's notes are handwritten and

_____

[2]Plaintiff later noted that the therapy "didn't happen" because of insurance problems. (Tr. at 386.)

6

somewhat hard to decipher. (Tr. at 371-74.) At one point, he noted that plaintiff had a slow gait and was very slow getting up on the table but "walking out OK." (Tr. at 374.)

The medical records then skip to August 2007, when plaintiff saw Dr. Timothy Bartz, a chiropractor, for complaints of neck, back, hip, foot, and shoulder pain. (Tr. at 379-84.)

On October 23, 2007, after she filed her application for benefits, the Social Security Administration ("SSA") set up a consultative examination with Dr. Donna Davidoff. (Tr. at 385.) Plaintiff came to the consult with a typed list of her symptoms, including pain in her back, neck, and left hip. She reported that her left shoulder was "shattered" and described her hands and wrists as painful. She also used the word "spasticity," which she found on the internet, in describing a jerking sensation in her arms and legs. She reported that her neck went out of joint, she could not turn her neck, and driving made it worse. Any activity, no matter how little, caused a severe grabbing sensation in her back. Tylenol PM did not provide much relief. (Tr. at 386.) Plaintiff reported that she could get herself up, washed, and dressed, and managed light household chores, such as laundry and groceries; she drove short distances. She stood 5'5-½" tall and weighed 271 pounds. Physical exam revealed no neurological deficits, no muscular atrophy, and no warmth, redness, or swelling of any joints. (Tr. at 387.) Strength was good in both upper and lower extremities. (Tr. at 387-88.) Despite reluctance, she was able to raise briefly on her toes, briefly on heels, maintain single limb support on the right and left, and do a squat. Dr. Davidoff noted rotatory scoliosis in the mid-thoracic region, and tender areas over the right iliac crest and left sacroiliac joint. Plaintiff achieved 10 degrees of lateral bending to either side, resisting further movement because of pain. She achieved 70 degrees of forward flexion. Dr. Davidoff's impression was history of low back pain after a fall, history of diffuse joint pain, and overweight. Her recommendation was to review the medical records

7

of recent chiropractic and other medical examinations. (Tr. at 388.) Dr. Davidoff ordered x-rays of the left hip, which showed no acute fracture or dislocation (Tr. at 391), and lumbar spine, which showed no acute fracture or subluxation, and levoscoliosis at the thoracolumbar junction (Tr. at 389).

On December 6, 2007, state agency consultant Dr. Syd Foster completed a physical residual function capacity ("RFC") assessment, finding plaintiff capable of medium work with no additional limitations. (Tr. at 392-99.) Dr. Foster noted that plaintiff previously applied for and was denied benefits in 2004, and that she had no recent medical care. He further noted Dr. Davidoff's finding of normal strength, no atrophy, etc., and the "pretty benign" x-rays. (Tr. at 393.) On March 4, 2008, Dr. Mina Khorshidi completed a physical RFC assessment for the SSA, finding plaintiff capable of light work with no further limitations. (Tr. at 407-14.)

Plaintiff next obtained treatment on October 2, 2009, when she saw Dr. Thomas Doers regarding her neck pain. X-rays showed age appropriate spondylosis and probable failure of segmentation at C5-C6, but were otherwise relatively unremarkable. (Tr. at 432, 434.) Dr. Doers had a long discussion with plaintiff regarding the etiology and prognosis of degenerative changes in the cervical spine. He outlined a complete course of treatment options from operative to non-operative, but plaintiff "apparently was not satisfied with any of these explanations or options for treatment." (Tr. at 432.) He encouraged her to remain as active as possible and use local modalities such as heat, ice, or other things that would seem to help her. (Tr. at 432.)

On May 13, 2010, plaintiff saw Dr. Fideler complaining of progressive neck and shoulder pain. (Tr. at 435.) Dr. Fideler ordered an MRI of the left shoulder, which revealed no evidence of significant rotator cuff tear; moderate edema throughout the superior humeral head, likely

degenerative; and mild degenerative changes of the AC joint (Tr. at 436); and the cervical spine, which revealed a thin central cord syrinx[3] measuring less than 1 mm in diameter from C4 through T1, and mild to moderate degenerative changes of the cervical spine, most significant at C6-C7 with left foraminal narrowing (Tr. at 438, 440, 442).  On May 24, plaintiff returned to Dr. Fideler for review of the scans, and he noted that the "shoulder looks relatively good."  (Tr. at 450.)  Plaintiff did have some degenerative disc disease in her cervical spine, "but nothing that looks terribly significant."  (Tr. at 450.)  On exam, she displayed positive impingement signs at the left shoulder.  She ambulated with a normal heel-to-toe gait without any assistive devices.  She demonstrated full range of motion of the upper extremities, with good muscle strength and tone.  He recommended that she continue with conservative treatment.  (Tr. at 450.)

On July 7, 2010, plaintiff saw Dr. James McCoy for a blood pressure check.  Dr. McCoy noted recent lab studies diagnostic for type 2 diabetes and hyperlipidemia.  Plaintiff reported intermittent dizziness occurring with changes in position.  (Tr. at 446, 452.)  Dr. McCoy prescribed hydrochlorothiazide for high blood pressure.  (Tr. at 447.)

Also on July 7, 2010, plaintiff saw Dr. Ronald Garcia at the sports medicine clinic in consultation on the request of Dr. McCoy for evaluation of an MRI abnormality in the cervical spinal cord.  Dr. Garcia reassured plaintiff that she did not require surgical treatment at that time. Dr. Garcia was asked to consider whether any of plaintiff's symptoms were related to the syrinx shown on the MRI.  Plaintiff reported pain pretty much all over her body; she also complained of dizziness.  (Tr. at 444.)  She further reported some walking difficulty, as well as

_____

[3]A syrinx is a fluid-filled cyst in the spinal cord.  See Stedman's Medial Dictionary 1775 (27th ed. 2000); http://www.ninds.nih.gov/disorders/syringomyelia/detail_syringomyelia.htm.

a history of scoliosis. On exam, she had moderate restriction with active range of motion of the cervical spine in all planes of movement. No signs of instability of the cervical spine were noted, however, and muscle tone and strength were normal in the cervical area. On exam of the spine and pelvis, she was noted have scoliosis in the thoracolumbar spine and mild restriction with active range of motion of the thoracolumbar spine in all planes of movement. She also had mild diffuse tenderness on palpation of the thoracic and lumbar spinous processes. No signs of instability were noted in the thoracolumbar spinal segments, however, and she had normal muscle strength and tone in the spinal area. On examination of the upper extremities, she had full, pain-free, active range of motion of the shoulders, elbows, wrists, and fingers with no signs of instability. Strength was 5/5 proximally and distally in both upper limbs, and muscle tone normal in both upper limbs. On lower extremity exam, she had full, pain-free, passive range of motion of the hips, knees, and ankles with no signs of instability. Strength was 5/5 in both lower limbs with normal muscle tone. Straight leg raising was negative bilaterally.[4] She had a normal, stable, non-antalgic gait, and no loss of balance was noted. (Tr. at 445.) In his assessment, Dr. Garcia noted a completely normal neurologic examination and as such it did not appear that the syrinx finding on the MRI was causing any neurologic impairment. She did have multi-level cervical spondylosis that may be contributing to the loss of range of motion in the neck and also pain in that area. The scoliosis in the thoracolumbar

---

[4]Straight leg tests are done to help find the reason for low back pain. If the patient experiences pain down the back of her leg when the affected leg is raised, the test is positive, meaning one or more of the nerve roots leading to the sciatic nerve may be compressed or irritated. Compression or irritation of the nerve roots leading to the sciatic nerve can have several causes, but the most common is a herniated disc in the low back. http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-ov erview.

spine may also be contributing to her back pain. Dr. Garcia assured plaintiff that the syrinx was not causing any neurologic impairment and recommended repeating the MRI in six months to see if there were any changes in the size of the syrinx. If so, he would refer her to neurosurgery for further evaluation; if not, then he would not recommend any further treatment or diagnostic testing. Plaintiff complained of tics in the arms, legs, and face, but Dr. Garcia indicated this was beyond his speciality and recommended she see a neurologist. (Tr. at 443.)

On July 12, 2010, Dr. McCoy diagnosed syringomyelia[5] and chronic neck pain, providing a referral to neurology. (Tr. at 448.) In July 2010, plaintiff also saw Dr. Dorin Karlic, a chiropractor, regarding her back and neck pain. (Tr. at 425-30.)

On January 20, 2011, plaintiff saw Dr. Lyle Weintraub for a variety of issues, including chronic neck and shoulder pain. She took no medications aside from over-the-counter pain pills. (Tr. at 453.) She was supposed to be on hydrochlorothiazide but indicated that it made her sick. (Tr. at 453-54.) On exam, her blood pressure measured 150/94, 134/98 on recheck; she weighed 270 pounds at a height of 65 inches, a body mass index of 45. She had full range of motion of both shoulders, but with pain on the left. (Tr. at 454.) Dr. Weintraub assessed chronic neck and back pain, diabetes, hypertension, and hyperlipidemia. He suggested a cardiology consult based on an abnormal EKG. (Tr. at 456, 457.)

On May 11, 2011, plaintiff saw Dr. Shashi Bhushan, who noted a blood pressure reading of 170/102 and weight of 275 pounds. Plaintiff complained of neck pain with movement and could not lay on the exam table because she said the pain in her neck would come back.

---

[5]Syringomyelia is a disorder in which a cyst (syrinx) forms within the spinal cord. The cyst may expand over time, damaging the spinal cord and compressing nerve fibers. http://www.ninds.nih.gov/disorders/syringomyelia/detail_syringomyelia.htm.

Strength of the lower extremities was 4/5, upper extremities 5/5.  Dr. Bhushan sent plaintiff for an MRI of the neck.  She had been taking ibuprofen and Tylenol for pain and was told to continue with that.  Dr. Bhushan also prescribed Lisinopril for her high blood pressure and sent her for a blood test related to her diabetes.  (Tr. at 460-61.)

## B.    Administrative Proceedings

Plaintiff filed the instant application for benefits on July 30, 2007 (Tr. at 189, 193),[6] indicating that she could not work due to back, neck, shoulder, and foot pain, which she traced to her fall at work in August 2001.  She indicated that she last worked in January 2002.  (Tr. at 221-22.)  In a function report, plaintiff wrote that if she did much of anything during the day she would be in pain that night and unable to sleep even with over-the-counter pain medication. (Tr. at 248.)  In addition to the pain since her 2001 accident, plaintiff indicated that for the past year and a half she experienced spasticity, which jolted her awake.  She reported limitations in personal care (Tr. at 249), problems thinking clearly with the pain medication (Tr. at 250), and needing help with housecleaning (Tr. at 251).  She wrote that she could not walk very far because of pain in her right foot.  (Tr. at 254.)

The SSA denied plaintiff's claim initially (Tr. at 116-17, 131-30) and on reconsideration (Tr. at 118-19, 144-52), so she requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 153).  Plaintiff failed to appear for the hearing, causing the ALJ to dismiss her request. (Tr. at 120-24.)  However, the Appeals Council determined that plaintiff had not received the notice and thus remanded for a hearing.  (Tr. at 125-27.)

---

[6]As indicated above, plaintiff also applied for benefits in 2004, alleging onset dates of August 30, 2001, and January 4, 2002.  Those applications were denied in 2004.  (Tr. at 202, 216, 233.)

On June 5, 2012, plaintiff appeared with counsel for her hearing before the ALJ. (Tr. at 91.) At the hearing, counsel amended the onset date to August 16, 2006, the date of plaintiff's 55th birthday.[7] (Tr. at 93.)

Plaintiff testified that she was 60 years old, 5'5" tall and 260 pounds, with a bachelor's degree in recreation. (Tr. at 95-96.) She indicated that she last worked in January 2002 as a cafeteria attendant at the Grand Geneva Resort. (Tr. at 96.) She returned to school in 2006 to try to become a social worker (Tr. at 96-97), but despite accommodations she was unable to complete her degree (Tr. at 98-99). She relied on food share, rental assistance, and help from family and friends to support herself. (Tr. at 97.) She reported past work as a cafeteria attendant, recreation assistant, and housekeeper. (Tr. at 105-07.)

Plaintiff explained that she hurt herself at work in August 2001 when she slipped on some water while carrying pans, injuring her shoulder, neck, and hip. (Tr. at 99, 105.) Her shoulder healed, but she continued to have pain. (Tr. at 100.) She also complained of pain in her low back, which caused problems reaching and rotating, and in her neck, which caused instability. (Tr. at 101-02.) She could not lift more than ½ gallon of milk without pain. (Tr. at 102-03.) She further testified to significant limitations in walking and standing because her "lower back starts hurting" and her right foot "just caves." (Tr. at 103.) She sometimes used an assistive device to walk, but the cane, in turn, caused pain in her hand and shoulder. (Tr. at 104.) She reported doing very little around the house and occupied her time talking to

_____

[7]In a pre-hearing submission, counsel argued that plaintiff should be found disabled as of her 55th birthday under Medical-Vocational Rule 202.04. (Tr. at 463-64.) Under that Rule, a person of advanced age with unskilled work experience is considered disabled if unable to perform her past work and limited to light work. See 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 202.04.

13

neighbors.  (Tr. at 108.)

The ALJ summoned a vocational expert ("VE"), Robert Verkins, who classified plaintiff's past work as a cafeteria attendant, housekeeper, and recreation aide as light and unskilled, with no transferable skills.  (Tr. at 112-13.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of light work (lifting up to 20 pounds, sitting for six out of eight hours, and standing for six out of eight hours).  The VE indicated that such a person could perform plaintiff's past work, as well as other jobs including light industrial assembly, production inspector, and machine feeder.  (Tr. at 113.)  In a second hypothetical, the ALJ limited the person to lifting five pounds, standing and sitting for a total of four to six hours in an eight hour day, and walking ½ block at a time, with absences from work two or more random days each month due to pain and fatigue.  The VE testified that there would be no competitive employment for such a person.  (Tr. at 113-14.)

On June 19, 2012, the ALJ issued an unfavorable decision.  (Tr. at 38.)  The ALJ first noted that plaintiff had, at the hearing, amended the onset date from August 30, 2001 to August 16, 2006, and that she remained in insured status through December 31, 2006.  (Tr. at 41.)  Then, following the familiar sequential evaluation process, the ALJ determined (1) that plaintiff had not engaged in substantial gainful activity ("SGA") since August 30, 2001 (Tr. at 43); (2) that she suffered from the severe impairments of obesity and arthropathies (Tr. at 44); (3) that none of plaintiff's impairments qualified as conclusively disabling under the Listings (Tr. at 44-45); and (4) that she retained the RFC to perform the full range of light work, consistent with her past relevant work as a cafeteria attendant, housekeeper, and recreation assistant (Tr. at 45-49).

In making his RFC determination, the ALJ rejected plaintiff's claims of greater limitations,

14

finding that her statements were not consistent with the medical evidence, including the relatively unremarkable exam findings, imaging studies showing only mild to moderate changes, and the absence of any corroboration for plaintiff's reported need for a cane, feet "giving out," and inability to stand, tend to personal hygiene, make meals, or engage in other normal daily activities. (Tr. at 48.) The ALJ further noted that plaintiff's description of her claimed shoulder, back, and neck pain was vague and general, "lacking the specificity which might otherwise make it more convincing." (Tr. at 48.) Finally, the ALJ noted that plaintiff worked at the SGA level only sporadically prior to the alleged disability onset date, which raised the question of whether her continued unemployment was actually due to medical impairments. (Tr. at 49.)

The ALJ also considered the medical opinion evidence, noting that no treating source provided a statement of functional limitations, other than Dr. Grossman, who assessed plaintiff shortly after her 2001 injury. Because that assessment was dated September 2001 and was intended to apply during plaintiff's healing period after her shoulder injury, it had little influence on the determination of plaintiff's RFC. (Tr. at 49.) The ALJ noted that Dr. Davidoff, the consultative examiner, provided a report of plaintiff's symptoms, physical exam findings, and three diagnoses (two of which were by history). However, because Dr. Davidoff did not provide a statement of work capacity based on her findings, the ALJ gave her report little weight. (Tr. at 49.) Finally, the ALJ considered the reports of the state agency consultants, Drs. Foster and Khorshidi. Dr. Foster found plaintiff capable of medium work, while Dr. Khorshidi limited her to light work. The ALJ gave weight to Dr. Khorshidi's assessment, which gave appropriate consideration to plaintiff's obesity, neck and shoulder pain, but also accounted for the relatively benign physical exam findings. The ALJ found the limitation to light work adequate, given

plaintiff reported symptoms, to the degree they were credible. (Tr. at 49.)

The VE described plaintiff's jobs as a cafeteria attendant, housekeeper, and recreation aide as light and unskilled. Comparing plaintiff's RFC with the demands of these jobs, the ALJ found that she was still able to perform them as actually and generally performed. The ALJ therefore found her not disabled. (Tr. at 50.)

On July 23, 2013, the Appeals Council denied review. (Tr. at 1.) The ALJ's decision thus became the final word of the Commissioner on plaintiff's application. See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013).

## II. STANDARD OF REVIEW

"[The court] will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pepper v. Colvin, 712 F.3d 351, 361-62 (7th Cir. 2013) (internal quote marks omitted). The court may not, under this deferential standard, re-weigh the evidence or substitute its judgment for the ALJ's. Id. In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence. Id.

In determining whether a decision is supported by substantial evidence, the court limits its review to the material that was before the ALJ; evidence first presented to the court may not form the basis of reversal under 42 U.S.C. § 405(g), sentence four. See Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993). A claimant may obtain a remand pursuant to § 405(g), sentence six, if she presents new and material evidence, and shows good cause for failure to incorporate that evidence into the administrative record. Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003). Evidence is new if it was not in existence or

16

available to the claimant at the time of the administrative proceeding. Id. Evidence is material if there is a reasonable probability that the ALJ would have reached a different conclusion had he considered it. Id.

## III. DISCUSSION

In her brief, plaintiff contends that the case was not presented completely. She excerpts various medical records from the administrative transcript (Pl.'s Br. at 2-7), which the ALJ did not specifically discuss. "The ALJ need not, however, discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ considered the impairments discussed in these records, including plaintiff's scoliosis (Tr. at 44); the degenerative changes to her spine (Tr. at 47); her chronic neck and back pain (Tr. at 47-48); her shoulder injury and pain (Tr. at 46, 49); her fractured left arm and AC joint separation (Tr. at 45); and her right foot pain (Tr. at 46).[8] Plaintiff fails to explain how any of these records demonstrate greater limitations than those found by the ALJ.[9] Plaintiff also references Dr. Fideler's 5% ppd finding, but she points to nothing specific in that report contradicting the ALJ's RFC determination. See also Gray v. Chater, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995) ("The issue of disability for purposes of workers' compensation is different from the issue of disability for purposes of Social Security disability benefits and SSI benefits. . . . Moreover, there is no

---

[8]The ALJ did specifically discuss plaintiff's treatment with Dr. Bartz in 2005 (Tr. at 46), referenced by plaintiff on page 6 of her brief.

[9]Plaintiff notes the slightly different findings on the September 2003 x-ray of her right foot, which the ALJ did not discuss, as compared to the February 2002 scan, which the ALJ did mention. (Pl.'s Br. at 7.) However, she fails to explain the significance to her disability claim.

such thing as partial disability for purposes of the Social Security Act."). Therefore, the ALJ's failure to specifically discuss this evidence was, at most, harmless error. See Sims v. Barnhart, 309 F.3d 424, 431 (7th Cir. 2002) (affirming where none of the evidence the ALJ overlooked supported disability); Schurr v. Colvin, No. 12-C-0969, 2013 WL 1949615, at *13-14 (E.D. Wis. May 9, 2013) (declining to remand where the ALJ failed to specifically discuss certain treatment records but did recognize the conditions and treatment referenced therein).

Plaintiff next mentions her evaluation by Dr. Doers in October 2009, including the x-ray showing probable partial anterior fusion at C5-C6. (Pl.'s Br. at 8; Tr. at 434.) She indicates that this is the same area where the syrinx was noted in the May 2010 cervical MRI ordered by Dr. Fideler.[10] The ALJ discussed the updated imaging studies from 2010, as well as Dr. Garcia's July 2010 evaluation of plaintiff's cervical spine, noting Dr. Garcia's belief that plaintiff's multi-level cervical spondylosis may be contributing to her limited neck range of motion. (Tr. at 47, 443.) However, the ALJ also noted Dr. Garcia's completely normal neurologic examination, which suggested that the syrinx shown on the MRI was not causing any neurologic impairment. (Tr. at 47, 443.)[11]

Plaintiff contends that since the accident she has been in pain or on pain relievers,

_____

[10]Plaintiff notes that Dr. Fideler also ordered a repeat shoulder MRI in May 2010, which showed a problem with her clavicle. As discussed above, the 2010 left shoulder MRI revealed no evidence of significant rotator cuff tear; moderate edema throughout the superior humeral head, likely degenerative; and mild degenerative changes of the AC joint. (Tr. at 436.) On review of the scan, Dr. Fideler noted that plaintiff's "shoulder looks relatively good." (Tr. at 450.)

[11]For his part, Dr. Fideler found that plaintiff's cervical degenerative disc disease did not look "terribly significant," recommending conservative treatment. (Tr. at 450.) Dr. Doers encouraged plaintiff to remain as active as possible and use local modalities such as heat and ice. (Tr. at 432.)

18

which affect her cognition. (Pl.'s Br. at 9.) The ALJ considered plaintiff's claims in this regard, noting that she generally controlled her pain with over-the-counter medications (Tr. at 47; see also Tr. at 335, 363, 453); that her claims of significant limitations were inconsistent with the objective medical evidence, including the relatively unremarkable exam findings and imaging studies showing only mild to moderate degenerative changes (Tr. at 48; see also Tr. at 299-300, 358, 436, 442); that her pain complaints were vague and general, lacking the specificity that might make them more credible (Tr. at 48; see also Tr. at 100, 366); and that her limited pre-onset work history raised the question of whether her continued unemployment was due to medical impairments (Tr. at 49; see also Tr. at 205, 215). These were legitimate reasons for discounting plaintiff's claims. See, e.g., McCurrie v. Astrue, 401 Fed. Appx. 145, 149-50 (7th Cir. 2010) (affirming the ALJ's reliance on the claimant's sporadic work prior to his allegedly disabling back injury); Simila v. Astrue, 573 F.3d 503, 518-19, 520 (7th Cir. 2009) (finding that the ALJ properly considered the lack of objective medical evidence supporting complaints of severe pain, as well as the claimant's declining earnings prior to the onset of his alleged disability); Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) (finding that the ALJ could rely on the claimant's use of over-the-counter analgesics); Butera v. Apfel, 173 F.3d 1049, 1055-56 (7th Cir. 1999) (finding that the ALJ properly relied on the claimant's vague and indefinite description of pain).

Plaintiff also alleges instability in her cervical area, which causes her neck to get stuck, and instability in her thoracolumbar spine, affecting her ability to walk. (Pl.'s Br. at 10.) As the ALJ noted, however, the objective medical evidence offered no corroboration for plaintiff's complaints. (Tr. at 48.) The ALJ cited Dr. Garcia's examination finding of limited neck range of motion (Tr. at 47), and in that same evaluation Dr. Garcia noted no signs of instability of the

19

cervical spine or thoracolumbar spine, and a normal, stable gait, with no loss of balance. (Tr. at 445.) Dr. Fideler likewise noted a normal gait without any assistive devices. (Tr. at 450.) Plaintiff no cites no medical evidence to the contrary.

Plaintiff contends that since February 2006 she has experienced extreme spasms, particularly when trying to sleep. (Pl.'s Br. at 10-11.) The ALJ considered plaintiff's complaint of "nighttime neurological problems that started in 2006." (Tr. at 47.) As discussed, the ALJ found her claims not fully credible. Plaintiff also mentions extreme pain "like a spider is biting," and unbearable pain with walking, reported to several doctors. (Pl.'s Br. at 11.) However, statements about pain or other symptoms will not alone establish disability; there must be medical evidence of impairments that reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. § 404.1529(a); see also Berger v. Astrue, 516 F.3d 539, 533 (7th Cir. 2008). Plaintiff reported some of these concerns to Dr. Davidoff, but Dr. Davidoff's examination failed to substantiate them, and Drs. Foster and Khorshidi specifically found plaintiff capable of the standing/walking required of light work. (Tr. at 46-47, 49, 385-88, 392-99, 407-14.)

Plaintiff notes that she received services from the state Division of Vocational Rehabilitation ("DVR") in 2002 and again in 2004 after the SSA denied her first application. (Pl.'s Br. at 11; Tr. at 231, 462.) She indicates that she was unable to complete those programs. Plaintiff points to nothing specific in this evidence, which predates the relevant period, supporting a finding of disability under the Social Security Act.

Plaintiff contends that while the VE classified her past work as light, she was actually required to lift beyond that level in all of these positions. She specifically notes lifting 50 pound

pans of food and containers of milk in her last job.[12] (Pl.'s Br. at 12.) As the Commissioner notes, however, in a pre-hearing submission plaintiff classified the recreation assistant and housekeeper jobs as light. (Tr. at 272-75.) Further, as the ALJ indicated, the VE noted no distinction between plaintiff's past work as generally performed in the economy and as plaintiff actually performed it. (Tr. at 50, see also Tr. at 112-13.) In any event, plaintiff makes no claim that the VE erred in classifying these jobs as light as generally performed, which is sufficient to uphold the ALJ's decision. See, e.g., Galdamez v. Colvin, No. ED CV 13–00630, 2014 WL 292044, at *6 (C.D. Cal. Jan. 27, 2014) (noting that any error in concluding that the claimant could perform her past relevant work as actually performed was harmless because the ALJ also correctly concluded, based upon the VE's testimony, that she could perform her past relevant work as generally performed in the national economy ); Yeng Cher Khang v. Astrue, No. 11-cv-261, 2013 WL 625205, at *6 (W.D. Wis. Feb. 20, 2013 ("At step four the administrative law judge need only determine whether plaintiff could have performed his past work as he actually performed it or as it is generally performed.").

Finally, plaintiff attaches to her brief additional notes from Dr. Poplar. Because these notes were not before the ALJ, I may not rely on them to reverse his decision. Eads, 983 F.2d at 817. Plaintiff does not explicitly seek a sentence six remand, but the standards for such relief are not met regardless. Because these records existed at the time of the hearing – and plaintiff makes no claim that they were previously unavailable – they are not "new." Nor does plaintiff make any attempt to demonstrate "good cause" for her failure to provide this evidence to the ALJ. "While she appears now pro se, she was represented at the administrative level

---

[12]She also notes that she was required to go up and down stairs, but the ALJ did not find any limitation in plaintiff's ability to climb stairs.

by an attorney. And, a claimant represented by counsel is presumed to have presented her best case to the ALJ." Murtha v. Astrue, No. 3:10-cv-61, 2011 WL 672638, at *7 (S.D. Ind. Feb. 17, 2011) (citing Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007)). Neither can I find these records from late 2001, shortly after plaintiff's injury, material; they pre-date the relevant period by about five years, and plaintiff points to nothing specific in them supporting greater limitations.[13]

## IV. CONCLUSION

Plaintiff concludes that there is more than enough evidence to show that her impairments are "severe" under 20 C.F.R. § 404.1520(c). The ALJ agreed that plaintiff suffered from severe impairments (Tr. at 44) but found that those impairments did not prevent her from performing her past relevant work (Tr. at 49). Substantial evidence – including the consultants' reports, the treatment records, and the VE's testimony – supports that determination.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of May, 2014.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[13]Evidence preceding the alleged onset date need not be deemed irrelevant. (See Pl.'s Reply Br. at 1.) Indeed, in the present case, the ALJ considered plaintiff's treatment dating back to August 2001. (Tr. at 45.)